## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF NORTH CAROLINA
## NORTHERN DIVISION
## No. 2:13-CV-1-BO

| | |
|---|---|
| CAPE HATTERAS ACCESS | ) |
| PRESERVATION ALLIANCE, | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) |
| | ) |
| S.M.R. JEWELL, *et al.*, | ) |
| Defendants. | ) |
| and | ) |
| | ) |
| DEFENDERS OF WILDLIFE, | ) |
| NATIONAL AUDUBON SOCIETY, | ) |
| and NATIONAL PARKS | ) |
| CONSERVATION ASSOCIATION, | ) |
| Defendant-Intervenors. | ) |

**ORDER**

This cause comes before the Court on cross-motions for summary judgment. A hearing was held on these matters before the undersigned on March 24, 2014, at Elizabeth City, North Carolina. For the reasons discussed below, plaintiff's motion for summary judgment is denied, defendants' motion for summary judgment is granted in part and denied in part, and defendant-intervenors' motion for summary judgment is granted in part and denied in part.

## PROCEDURAL HISTORY

Plaintiff, the Cape Hatteras Access Preservation Alliance (CHAPA), filed a complaint for declaratory and injunctive relief in the United States District Court for the District of Columbia against the Department of the Interior, the National Park Service, and the Superintendent of Cape Hatteras National Seashore. Defenders of Wildlife, the National Audubon Society, and the National Parks Conservation Association were permitted to intervene as defendants without objection from plaintiff by order entered March 9, 2012. Following *sua sponte* consideration by

the court and by order entered December 23, 2012, this action was transferred to this Court pursuant to 28 U.S.C. § 1404(a). All parties have filed motions for summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure and agree that the claims can be properly decided on the administrative record (AR) and the pending motions.

## BACKGROUND

The Cape Hatteras National Seashore (the Seashore) was created by Congress in 1937, which decreed that, except for certain portions deemed especially adaptable for recreational use, the area would be "permanently reserved as a primitive wilderness and no development of the project or plan for the convenience of visitors shall be undertaken which would be incompatible with the preservation of the unique flora and fauna or the physiographic conditions [then] prevailing". 16 U.S.C. § 459a-2. The Seashore consists of more than 30,000 acres distributed along approximately sixty-seven miles of shoreline. Special Regulations, Areas of the National Park System, Cape Hatteras National Seashore – Off-Road Vehicle Management, 77 Fed. Reg. 3124 (Jan. 23, 2012) (codified at 36 C.F.R. pt. 7). At the time of its establishment, the areas surrounding the Seashore were sparsely populated and beach driving was primarily for transportation purposes and not recreation. *Id.*

"Improved access, increased population, and the popularity of the sport utility vehicle have resulted in a dramatic increase in vehicle use on the Seashore beaches." *Id.* Though beginning in the 1970s interim or draft off-road vehicle (ORV) management plans existed, no final ORV management plans were completed or published. Executive Order 11644, as amended by Executive Order 11989, requires that ORV use on federal lands be consistent with "the protection of the resources of the public lands, promotion of the safety of all users of those lands, and minimization of conflicts among various uses of those land," and that ORV areas and

2

trails be located in order to minimize damage to the natural environment and wildlife. The lack of a final ORV management plan further violated 36 C.F.R. 4.10(b), which requires that "[r]outes and areas designated for off-road motor vehicle use shall be promulgated as special regulations."

On October 18, 2007, defendant-intervenors (intervenors) in this matter filed a complaint in this Court against the National Park Service and the Department of the Interior alleging that the federal defendants' failure to issue a long-term plan and special regulation governing ORV use in the Cape Hatteras National Seashore violated, *inter alia*, the National Park Service Organic Act (Organic Act), 16 U.S.C. § 1, *et seq.*; the Seashore enabling legislation, 16 U.S.C. §§ 459-459a-10; Executive Order 11644, as amended by Executive Order 11989; and the National Environmental Policy Act (NEPA), 42 U.S.C. § 4321, *et seq.* No. 2:07-CV-45-BO. That matter was resolved by consent decree entered April 30, 2008. CHAPA was permitted to intervene as a defendant in the 2007 suit, where it represented its beach driving interests and participated in the resolution of the matter. The consent decree established that the federal defendants would complete an ORV Management Plan for the Seashore by December 31, 2010, and would complete and promulgate the final Special Regulation by April 1, 2011. The consent decree further established a modified interim management plan to be implemented pending the final special regulation. The modified interim management plan consisted of the interim strategy as described in a July 2007 Finding of No Significant Impact except as modified by the consent decree (interim strategy).

Beginning in 2008, a negotiated rulemaking committee, consisting of CHAPA's parent organization, intervenors, and NPS, attempted to come to a consensus on all issues regarding ORV management on the Seashore but were unable to do so. 72 Fed. Reg. 72,316 – 18. In

3

March 2010, the National Park Service (NPS) issued a draft environmental impact statement (DEIS) for the ORV management plan and special regulation. AR 36717-37523. NPS held a sixty-day comment period on the DEIS, and conducted five public hearings. AR 38402-04. Over 50,000 individual comments on the DEIS were derived from correspondence received by NPS. AR 38403.

In November 2010, NPS published a final environmental impact statement (FEIS). AR 37685-38872. A record of decision was published on December 28, 2010, wherein NPS selected Alternative F. AR 38757-976. NPS published a proposed rule on July 6, 2011, on which comments were made. The final rule was published in the *Federal Register* on January 23, 2012. The final rule "designates off-road vehicle routes and authorizes limited ORV use within Cape Hatteras National Seashore in a manner that will protect and preserve natural and cultural resources, provide a variety of safe visitor experiences, and minimize conflicts among various users." 77 Fed. Reg. 3123.

## DISCUSSION

A motion for summary judgment may not be granted unless there are no genuine issues of material fact for trial and the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). The moving party bears the initial burden of demonstrating the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). If that burden has been met, the non-moving party must then come forward and establish the specific material facts in dispute to survive summary judgment. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 588 (1986). In determining whether a genuine issue of material fact exists for trial, a trial court views the evidence and the inferences in the light most favorable to the nonmoving party. *Scott v. Harris*, 550 U.S. 372, 378 (2007). However, "[t]he mere existence of a scintilla

4

of evidence" in support of the nonmoving party's position is not sufficient to defeat a motion for summary judgment; "there must be evidence on which the [fact finder] could reasonably find for the [nonmoving party]." *Anderson v. LibertyLobby, Inc.*, 477 U.S. 242, 252 (1986).

Because both the federal defendants and intervenors raise arguments related to CHAPA's standing to bring this action, the Court addresses this issue first.

I.   STANDING

A.   Article III Standing

Standing is the determination of whether a particular individual is the proper party to assert a claim in federal court; it "is founded in concern about the proper–and properly limited role–of the courts in a democratic society." *Warth v. Seldin*, 422 U.S. 490, 498 (1975). The standing doctrine curtails the types of disputes that an Article III court can decide; it does so by requiring courts to hew to their express constitutional mandate of resolving "cases" and "controversies." U.S. Const. art. III, §2, cl. 1; *Warth*, 422 U.S. at 498. The standing question is one that asks "whether the litigant is entitled to have the court decide the merits of the dispute or of particular issues." *Warth*, 422 U.S. at 498. An affirmative answer to this question requires a plaintiff to demonstrate at least three "irreducible constitutional minimum" requirements:

> First, the plaintiff must have suffered an "injury in fact"-an invasion of a legally protected interest which is (a) concrete and particularized and (b) "actual or imminent, not "conjectural" or "hypothetical." Second, there must be a causal connection between the injury and the conduct complained of-the injury has to be "fairly . . . trace[able] to the challenged action of the defendant, and not ... th[e] result [of] the independent action of some third party not before the court." Third, it must be "likely," as opposed to merely "speculative," that the injury will be "redressed by a favorable decision.

*Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61 (1992) (internal citations omitted).

Intervenors contend that CHAPA, an association which has standing to bring suit on behalf of its members when, *inter alia*, its members would otherwise have standing to bring suit

5

in their own right or when the interests it seeks to protect are germane to the organization's purpose, *Hunt v. Washington State Apple Adver. Comm'n*, 432 U.S. 333, 343 (1977), has failed to allege that it has members, who they are, and whether any member would have standing to bring suit in his or her own right. Intervenors further contend that CHAPA has failed to allege that it or its members have suffered an injury in fact, that there is a causal connection between the injury and the conduct complained of, or that such injury will likely be redressed by a favorable decision here.

In its complaint, CHAPA alleges that it has over 10,000 active members and that its purpose is to protect and preserve local beaches within a framework of free and open beach access for all users, including properly licensed drivers and vehicles. Cmp. ¶ 7. CHAPA further alleges that its members regularly operate off road vehicles as a means to access seashore beaches for recreational and commercial purposes. Cmp. ¶ 8. Also in the record are declarations from three CHAPA members who attest that they access areas of the Seashore when permitted but have been frustrated by ORV access restrictions implemented under the final rule. Couch Decl. ¶ 6; Hamilton Decl. ¶¶ 5, 6; Davis Decl. ¶¶ 4,7. The declarations further attest to the damage to economic, aesthetic, and recreational interests of CHAPA's members. *See also* AR 8464-69 (summary of impact of final rule on CHAPA members).

Where, as here, a procedural injury is alleged, the standards for redressability and immediacy are relaxed. *See Lujan*, 504 U.S. at 572 n. 7. The Court finds that the allegations in the complaint, the declarations of CHAPA members, and the administrative record in this matter support that CHAPA has organizational standing in that some of its members would have standing to sue in their own right and because the interests CHAPA seeks to protect in this suit are germane to its mission. Further, CHAPA has sufficiently alleged invasion of a legally

6

protected interest that is causally connected to the issuance of NPS's final rule and that the injury would likely be redressed by a favorable decision. Thus, CHAPA has organizational and Article III standing to bring this action. *See also Cape Hatteras Access Preservation Alliance v. United States Dept. of Interior*, 344 F. Supp.2d 108, 117-18 (D.D.C. 2004) (holding that CHAPA had Article III standing to bring challenge to defendants' designation of piping plover critical habitat where CHAPA alleged economic, aesthetic, and recreational harm due to the effect of critical habitat designation on ORV use).

B.    Prudential Standing

In addition to Article III's case-or-controversy requirement, courts have imposed prudential limitations on standing which encompass "the requirement that a plaintiff's complaint fall within the zone of interests protected by the law invoked." *Elk Grove Unified Sch. Dist. v. Newdow*, 542 U.S. 1, 12 (2004) (quoting *Allen v. Wright*, 468 U.S. 737, 751 (1984)). NEPA provides for no private right of action, requiring parties who seek to bring claims under NEPA to file suit under the Administrative Procedures Act (APA). *Town of Stratford, Connecticut v. F.A.A.*, 285 F.3d 84, 88 (D.C. Cir. 2002). In order to bring suit challenging an agency action under the APA, a plaintiff must demonstrate that he is "adversely affected or aggrieved . . . within the meaning of a relevant statute." 5 U.S.C. § 702; *see also Taubman Realty Grp. L.P. v. Mineta*, 320 F.3d 475, 480 (4th Cir. 2003) (plaintiff challenging action under the APA must satisfy prudential in addition to constitutional standing requirement).

The federal defendants contend that CHAPA's claims do not fall within NEPA's zone of interests, which has been established to be the protection of the environment. *See Town of Stratford*, 285 F.3d at 88 (NEPA "cannot be used as a handy stick by a party with no interest in protecting against an environmental injury to attack a defendant."); *Western Radio Servs. Co.,*

*Inc. v. Espy*, 79 F.3d 896, 902-03 (9th Cir. 1996) ("NEPA's purpose is to protect the environment, not the economic interest of those adversely affected by agency decisions.").

Insofar as CHAPA's alleged environmental harms are preconditioned on its contention that NPS could have promulgated a rule that would allow for greater or enhanced ORV access on the Seashore, the Court is wary to find that such interests are sufficiently environmental in order to fall within NEPA's zone of interests. The Tenth Circuit recently addressed a similar question, and held that NEPA does not protect an injury where plaintiffs "are harmed because NPS could have promulgated a rule allowing more snowmobiles into Grand Teton without adverse environmental effects." *Wyoming v. U.S. Dep't of Interior*, 674 F.3d 1220, 1237-38 (10th Cir. 2012). However, "[u]nlike Article III standing, issues of prudential standing are non-jurisdictional and may be 'pretermitted in favor of a straightforward disposition on the merits.'" *United States v. Day*, 700 F.3d 713, 721 (4th Cir. 2012) (quoting *Finstuen v. Crutcher,* 496 F.3d 1139, 1147 (10th Cir. 2007)). Thus, the Court assumes without deciding that CHAPA has prudential standing to raise its claims under NEPA and proceeds to consider the merits of the instant action.[1]

## II.   ENABLING ACT CLAIM

In count one of its complaint, CHAPA contends that the final plan and rule are arbitrary and capricious, an abuse of discretion, and otherwise not in accordance with the Enabling Act. Specifically, CHAPA alleges that NPS overlooked the Enabling Act's provisions relating to

---

[1] Moreover, while many of the injuries alleged by CHAPA are economic in nature, CHAPA members have arguably alleged environmental harms by alleging that their ability to engage in recreational activities on the Seashore, such as fishing and shelling, has been curtailed by the implementation of the final plan and limited ORV access. "A plaintiff can . . . have standing under NEPA even if his or her interest is primarily economic, as long as he or she also alleges an environmental interest or economic injuries that are 'causally related to an act within NEPA's embrace.'" *Ranchers Cattlemen Action Legal Fund United Stockgrowers of Am. v. U.S. Dep't of Agric.*, 415 F.3d 1078, 1103 (9th Cir. 2005) (citation omitted).

8

portions of the Seashore deemed to be especially adaptable for recreational uses, and failed to even consider how that provision of the Enabling Act might affect its management of ORV use.

"The administration, protection, and development of the [Seashore] shall be exercised under the direction of the Secretary of the Interior by the National Park Service, subject to the provisions of [the Organic Act]. . . ." 16 U.S.C. § 459a-1. The Court considers first whether Congress' intent on the issue of whether recreational use or preservation should be paramount on the Seashore is clear. *Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837, 842-3 (1984). Second, if Congress' intent is not clear, the Court considers whether the NPS's interpretation in this instance is reasonable and consistent with the plain language of the statute. *Id*; *see also Grunewald v. Jarvis*, 930 F. Supp.2d 73, 84 (D.D.C. 2013) (applying two step *Chevron* analysis to dispute over whether NPS failed to comply with national park enabling act in developing wildlife management plan).

CHAPA frames its Enabling Act claim as simple: "NPS must give effect to the language of a park enabling act when that language is relevant to its planning decisions, harmonizing it with the Organic Act when the acts are in conflict (which in this case, they are not)." [DE 60 at 13]. The Court agrees that resolution of this issue is simple. While the Seashore's Enabling Act does specifically mention recreational activities, Congress' intent as to the priority of natural resource protection over recreational use on the Seashore is quite plain: no plan for the convenience of visitors should be implemented if it is incompatible with the preservation of the flora and fauna of the Seashore. 16 U.S.C. § 459a-2. As CHAPA concedes, the Seashore's Enabling Act and the Organic Act are not in conflict on this issue, and indeed "over twenty years of federal court decisions confirm[] that conservation is the predominant facet of the Organic

9

Act." *S. Utah Wilderness Alliance v. Nat'l Park Serv.*, 387 F. Supp. 2d 1178, 1191 (D. Utah 2005).

While CHAPA contends that NPS should have further considered ORV management in areas deemed to be especially adaptable for recreational use, CHAPA has not pointed to nor can the Court identify any basis for such claim. ORV use is not a recreational activity explicitly mentioned in the Seashore's Enabling Act, and the final rule exhibits that the NPS *did* extensively consider ORV use on the Seashore, as it designates more than twenty-eight miles to year-round ORV driving routes as well as forty-one miles to partial-year ORV use. *See* AR 8490-13647; 38493-38732. The Court does not find that CHAPA's bare assertion that NPS should have "meaningfully considered whether ORV use should be managed differently in" recreational areas can withstand defendants' motions for summary judgment. Moreover, entering judgment in favor of CHAPA on its Enabling Act claim would require the Court to override the broad discretion enjoyed by the NPS to implement its mandate to provide for an ORV management plan on the Seashore, which the Court finds no basis upon which to do. "[A]s Congress has delegated the administration and preservation of national park resources to Interior and the Park Service, these agencies enjoy broad discretion in implementing their statutory responsibilities under the authorizing statutes." *Edmonds Inst. v. Babbitt*, 93 F. Supp. 2d 63, 69 (D.D.C. 2000).

Accordingly, the federal defendants and intervenors are entitled to summary judgment in their favor on CHAPA's Enabling Act claim.

III.    NEPA CLAIMS

CHAPA's remaining claims challenge NPS's preparation of an environmental impact statement (EIS) and final rule under NEPA. NEPA's goal is to "protect and promote

10

environmental quality." *Hughes River Watershed Conservancy v. Glickman*, 81 F.3d 437, 443

(4th Cir. 1996). NEPA does not place substantive requirements on an agency, but "requires them

to follow certain procedures prior to undertaking any 'proposed action.'" *Hodges v. Abraham*,

300 F.3d 432, 438 (4th Cir. 2002) (quoting *Roberstson v. Methow Valley Citizens Council*, 490

U.S. 332 (1989)). In reviewing whether an agency acted in violation of NEPA, the court's role is

limited to determining whether the decision of the agency was arbitrary and capricious. 5 U.S.C.

§ 706(2)(A). A rule is arbitrary and capricious

> if the agency relied on factors that Congress has not intended it to consider,
> entirely failed to consider an important aspect of the problem, offered an
> explanation for its decision that runs counter to the evidence before the agency, or
> is so implausible that it could not be ascribed to a difference in view or the
> product of agency expertise.

*Hughes River*, 165 F.3d at 287-88. The agency's decision must therefore be reasonable, but it

need not be determined to be the most reasonable decision to withstand review. *River Runners*

*for Wilderness v. Martin*, 593 F.3d 1064, 1070 (9th Cir. 2010) (quotation and citation omitted).

NEPA requires that every agency proposing to engage in action that will significantly

affect the environment must prepare an EIS in which it takes a "hard look" at the impacts of the

proposed action. 42 U.S.C. § 4321, *et seq.*; *Nat'l Audubon Soc'y v. Dep't of Navy*, 422 F.3d 174,

181 (4th Cir. 2005). In determining whether an agency has taken a hard look at environmental

impacts, a court considers, after engaging in its own "searching and careful inquiry of the

record," *Friends of Back Bay v. United States Army Corps. of Engineers*, 681 F.3d 581, 587 (4th

Cir. 2012) (citation omitted), whether at a minimum the agency conducted "a thorough

investigation into the environmental impacts of an agency's action and a candid acknowledgment

of the risks that those impacts entail." *Nat'l Audubon Soc'y*, 422 F.3d at 185. A court may not

second-guess "substantive decisions committed to the discretion of the agency," nor does it

11

"rubber-stamp" any agency decision as having been based on adequate "consideration of the relevant factors." *Id.* Additionally, whether an agency has taken a hard look is contextual, and a reviewing court must take "a holistic view of what the agency has done to assess environmental impact." *Id.* at 186.

CHAPA makes the makes the following NEPA claims in its complaint. CHAPA challenges the NPS's use of a DEIS and FEIS that it contends lack sound scientific bases and otherwise impaired meaningful agency and public review. CHAPA specifically challenges NPS's use of two "no action" alternatives in the DEIS and FEIS as unsound and further challenges the range of alternatives considered by NPS, including the adoption of buffer distances and closures that did not take into account relevant factors other than species protection, contending that NPS failed to consider information and perspectives that differed from its pre-ordained result. Finally, CHAPA alleges that the NPS failed to meaningfully and accurately assess the economic impacts of the final plan's restrictions on beach access and use.

The Court considers each of the specific NEPA challenges as raised in CHAPA's motion for summary judgment.

A.   Use of Two No Action Alternatives

NEPA requires that an EIS include a no action alternative for comparative purposes. 40 C.F.R. § 1502.14(d); *see also Town of Winthrop v. F.A.A.*, 535 F.3d 1, 4 (1st Cir. 2008) (no action alternative is "one maintaining the status quo."). In this instance, NPS identified two no action alternatives against which to compare four action alternatives "because management changed part way through the planning process in May 2008, after the consent decree was signed." AR 37695. The first of the two no action alternatives used represents continuation of

12

management under the interim strategy, while the second represents continuation of the terms of the consent decree signed April 30, 2008. AR 37698-99.

CHAPA first challenges the use of two no action alternatives generally, stating that the regulations require use of only one no action alternative. The Court is unaware of any such restriction on an agency's selection of no action alternatives, and indeed other courts have held that the use of two no action alternatives is proper under NEPA. In *Montana Wilderness Association v. McAllister*, the Ninth Circuit upheld the United States Forest Service's use of two no action alternatives where the Service was uncertain of how it would implement a regional decision regarding off-highway vehicle use. 460 Fed. App'x 667 (9th Cir. 2011) (unpublished). The first alternative represented a continuation of the most recent plan, and the second no action alternative attempted to model future management actions which might be taken to implement the new regional decision; the court of appeals found nothing unreasonable about this approach. *Id.* at 671.

The Court finds similar circumstances present here. NPS's use of both the interim strategy and the consent decree management plans as baseline no action alternatives was not unreasonable. CHAPA contends in its summary judgment motion that the better no action alternative would have been *no* restrictions on ORV use whatsoever, but as NPS correctly stated in its FEIS, such alternative would be inadequate as would not accurately represent the environmental baseline of existing impacts. The management plan in place under the consent decree, no action Alternative B, was the status quo at the time NPS prepared the DEIS, thus it served as the appropriate baseline for comparison purposes. *Custer Cnt'y Action Ass'n v. Garvey*, 256 F.3d 1024, 1040 (10th Cir. 2001) ("Council on Environmental Quality intended that agencies compare the potential impacts of the proposed major federal action to the known

13

impacts of maintaining the status quo" when considering no action alternatives). The interim strategy was the status quo immediately prior to the implementation of the consent decree in 2008, and thus was a reasonable additional no action alternative as it represented the period of time just before implementation of the consent decree. The use of CHAPA's preferred no action alternative, the status quo in 2004, was considered by NPS and rejected as a viable baseline alternative, and CHAPA has not demonstrated that its decision to do so was unreasonable.[2]

CHAPA's arguments that NPS's use of a plan that arose out of litigation as a baseline was improper and that the FEIS is unreasonable because the final plan shares similarities with the consent decree are without merit. The realities facing NPS and the Seashore at the time of the development of the FEIS were that either management would continue under the consent decree, or, failing continuation of the consent decree or the adoption of a final rule, ORV use on the Seashore would be prohibited under 36 C.F.R. § 4.10. In selecting the no action alternatives, NPS did not consider any factors which it was not intended to consider, did not fail to consider an important aspect of the problem, nor do its explanations for selecting and ultimately rejecting the no action alternatives run counter to the evidence. *See e.g.* AR 39769 (no action Alternative A satisfies some plan objectives but seriously limits ability to meet natural resource and visitor safety objectives). Though CHAPA has demonstrated that it is dissatisfied with NPS's no alternative selections, it has simply failed to demonstrate that such selections were arbitrary or capricious.

---

[2] In point of fact, the NPS recognized that absent a special regulation to authorize ORV use, ORV use on the Seashore was actually prohibited. Thus, the legal status quo in 2004 should have been no ORV use on the Seashore. NPS ultimately excluded no ORV use as a baseline no action alternative, however, as it would not represent "a viable alternative for meeting the purpose and need for this action" and would not serve as an appropriate environmental baseline of existing impacts. AR 37697-98.

14

B.    Assessment of Social and Economic Impacts

CHAPA contends that NPS failed to evaluate sufficiently all of the significant social and
economic effects of the plan by underrepresenting the impact of the plan on small business,
failing to consider the differences between local communities and more remote areas,
understating the economic impacts on the local communities, and cutting short its assessment
and failing to provide sufficient opportunity for public comment due to concern for meeting a
deadline imposed by the consent decree.

At the outset, the Court notes that while the assessment of socioeconomic impacts of
proposed agency action may be appropriate, those concerns are secondary under NEPA to the
impact of the proposed action on the natural environment. *Image of Greater San Antonio, Tex. v.
Brown*, 570 F.2d 517, 522 (5th Cir. 1978) (NEPA's "primary concern was with the physical
environmental resources of the nation."); *see also* 40 C.F.R. § 1508.14 (socioeconomic impacts
will not trigger requirement for preparation of EIS, but where EIS is prepared and socioeconomic
effects are interrelated with natural and environmental effects, EIS should discuss all effects).
CHAPA's first specific argument relates to NPS's reliance on data from Hyde and Dare Counties
and data that included the northern villages, which CHAPA contends was used in order to
obscure the impact of ORV management plans on the villages within and therefore most affected
by accessibility of the Seashore.

The record reveals that NPS fully recognized that the "villages . . . would be most
affected by the proposed actions because they are located within the Seashore and depend most
directly on tourists visiting the Seashore for their livelihood." AR 38060. In regard to small
businesses, NPS expressly recognized that "[s]mall businesses . . . comprise the majority of
businesses relying directly on ORV users as a large source of revenue [and] [t]hese small

15

businesses may not have the resources to respond to increased fluctuation in visitation from year to year [and] may be disproportionately affected relative to large business." AR 38336. NPS further considered the projected revenue impacts on specific businesses located in the Seashore villages as well as the rest of the region of influence, which includes the larger towns located on Bodie Island north of the Seashore. AR 38328; 38060. Finally, NPS applied each alternative to its socioeconomic data. For example, NPS recognized Alternative F would impact commercial and recreational fisherman who would but for night-driving restrictions fish for longer hours, which could deter recreational fisherman from visiting the Seashore resulting in direct losses to the local economy, and that the addition of a permit system could reduce visitation by ORV users relative to the no-action alternatives due to additional costs. AR 38360-63.

Contrary to CHAPA's assertion, NPS's data do not obfuscate the impacts of any proposed alternative on the local economy, and indeed NPS fully recognized that the implementation of any of its proposed alternatives would have certain adverse or potentially adverse economic impacts. What is required by NEPA is not that NPS change its approach because adverse economic effects have been identified, but rather that NPS engage in a thoughtful and careful review of the impacts of its proposed action, both beneficial and detrimental, prior to engaging in its proposed action. "Because NEPA is a procedural and not a results-driven statute, even agency action with adverse [human] environmental effects can be NEPA-compliant so long as the agency has considered those effects and determined that competing policy values outweigh those costs." *Ohio Valley Envtl. Coal. v. Aracoma Coal Co.*, 556 F.3d 177, 191 (4th Cir. 2009).

Having reviewed the record in this matter, the Court finds that NPS took the appropriate hard look at the socioeconomic impact of its proposed activities and properly and reasonably

16

considered such impact against the competing policy values of compliance with 30 C.F.R. § 4.10 and implementation of a special regulation regulating ORV use on the Seashore. That NPS recognized that long-term impacts would be difficult to quantify due to uncertainties such as national economic trends, demographic trends, meteorological events such as storms and erosion, as well as the nesting patterns of birds and turtles does not make its conclusions arbitrary or capricious. Indeed, a failure to recognize the specific and sometimes unique uncertainties facing the Seashore in its study of socioeconomic or human impacts could actually have served to render NPS's conclusions arbitrary or capricious.

The Court does not find that the agency's actions reveal a rush to meet a deadline at the expense of public comment and review. The deadline for a final plan included in the consent decree was extended several times, AR 39977; 39988, and CHAPA has not demonstrated that additional time would have been required in order for NPS to engage in a sufficiently hard look at the impacts of its proposed action. CHAPA further contends that NPS should have prepared an analysis of indirect impacts under the Regulatory Flexibility Act, 5 U.S.C. §§ 601, *et seq.*, but the Court does not find unreasonable NPS's conclusion that the final rules would not directly regulate small businesses and that an analysis was therefore not required. *See* AR 24994-24999 (noting that commercial fisherman and businesses requiring beach access would not have to pay for a beach-driving permit); AR 30830 (Small Business Association recognizes that the rule "will not directly regulate small businesses and will have indirect economic effects only.").

Nor was NPS required to prepare a supplemental EIS to present additional data gathered after the close of the DEIS comment period. The agency's decision that the new data did not present "a *seriously* different picture of the environmental impact of the proposed project from what was previously envisioned," was not arbitrary or capricious, and thus a supplemental EIS

17

was not required. *Hickory Neighborhood Def. League v. Skinner*, 893 F.2d 58, 63 (4th Cir. 1990) (quotation omitted) (noting that decision not to prepare supplemental EIS reviewed under arbitrary and capricious standard); *see also* AR 38673-74 (results of survey of local village businesses, ORV count at selected ramps, and visitor intercept study did not present significant new information and were consistent with information present in DEIS). "The NEPA process involves an almost endless series of judgment calls . . . [and] [t]he line-drawing decisions necessitated by this fact [] are vested in the agencies, not the courts." *Coal. on Sensible Transp., Inc. v. Dole*, 826 F.2d 60, 66 (D.C. Cir. 1987). The Court does not find that NPS's decision not to engage in an indirect economic impact study or to issue a supplemental EIS were unreasonable in this instance.

C. Consideration of Range of Buffer Distances and Floating Closures

"The existence of reasonable but unexamined alternatives renders an EIS inadequate." *Friends of Se.'s Future v. Morrison*, 153 F.3d 1059, 1065 (9th Cir. 1998). The focus, however, is on "reasonable" alternatives, meaning those which are "practical and feasible from the technical and economic standpoint and using common sense, rather than simply desirable from the standpoint of the applicant." Forty Most Asked Questions Concerning CEQ's National Environmental Policy Act Regulations, 46 Fed. Reg. 18026-01 (March 23, 1981).

CHAPA's attempts to demonstrate that NPS failed to consider a range of reasonable alternatives and thus that its FEIS is flawed fail. The core of CHAPA's claim regarding the reasonableness of the alternatives considered by NPS amounts to an argument that the bases cited by the agency for its selected range of alternatives "suggest significant bias in favor of species protection and against ORV use." AR 08474. As discussed above, however, NPS is mandated to implement no "project or plan for the convenience of visitors . . . which would be

18

incompatible with the preservation of the unique flora and fauna or the physiographic conditions" of the Seashore. 16 U.S.C. § 459a-2. Therefore, while NPS endeavored to implement an ORV management plant which would accommodate ORV and pedestrian traffic on the Seashore, a reasonable alternative would not include a plan in which ORV use was favored above or at expense of the preservation of the Seashore's unique flora and fauna.

Though NPS considered a range of buffer distances, *see e.g.* AR 38011; 38022, CHAPA contends that NPS could have considered other buffer distances, but does not provide the Court with any specific buffer distance or range that should have been considered but was not. The only specific example relied upon by CHAPA is the inclusion of a "drive-through" section suggested by the North Carolina Wildlife Resources Commission. AR 26265-69. That alternative was considered, but was rejected based on, *inter alia*, the opinion of a biologist at North Carolina State University and the research he and others had conducted regarding interference with American Oystercatcher chicks. AR 26277-26422.

Regarding CHAPA's allegation that NPS failed to take a hard look at the use of floating closures rather than fixed closures, the record demonstrates that this alternative was considered and that the basis upon which it was rejected was reasonable. As CHAPA and NPS both recognize, the Seashore is "part of a dynamic barrier island system," which is in constant flux due to, among other things, changes in sea level and the presence of erosion and overwash. AR 37771. While using floating closures would be one way to address these yearly and seasonal changes, NPS determined that "fixed" closures, which could be modified every five years to adapt to changing conditions, or after storm events, or after significant change in protected species status, would provide for more predictability in the visitor experience and simplify

19

resource management. AR 38689. The Court finds this conclusion and explanation to be reasonable and based on NPS's consideration of the relevant data.

D.     Scientific Basis

CHAPA's general allegation that the DEIS and FEIS were unsupported by science is facially without merit. In conducting its review of the record in the instance, the Court finds it to be replete with scientific studies and data regarding the Seashore's wildlife as well as planning and economic analyses. *See e.g.* AR 38461-38484 (Literature Review, App'x A to FEIS); AR 40314-40327; AR 42590-42603; AR 45480-45495; AR 52238-52251; AR 64920-64927; AR 73618-73733. Moreover, NPS relied on its own data collected under the consent decree regarding beach use, closures, and wildlife response. *See e.g.* AR 73325-73346.

CHAPA's specific challenge to the validity of the science upon which the FEIS is based is again primarily focused on the buffer distances selected by NPS in its final plan. "NEPA does not require [a court] to decide whether an EIS is based on the best scientific methodology available or to resolve disagreements among various experts." *Laguna Greenbelt, Inc. v. U.S. Dep't of Transp.*, 42 F.3d 517, 526 (9th Cir. 1994); *see also Audubon Naturalist Soc'y of The Cent. Atl. States, Inc. v. U.S. Dep't of Transp.*, 524 F. Supp. 2d 642, 712 (D. Md. 2007) (noting that agencies may rely on the views and opinions of their own experts where there is a conflict in opinions). The record reveals that NPS relied on scientific data to support its findings regarding the protection and preservation of wildlife, as well as its own data regarding visitor demands on the Seashore. AR 37832-33. CHAPA has identified no study or data which would invalidate or call seriously into question NPS's conclusions, and thus the Court will not look behind the agency here, in particular in regard to areas within NPS's own expertise. *See Hughes River*, 165 F.3d at 288 (where agency considered and responded to comments which called into question its

20

scientific conclusions, NEPA's hard look requirement satisfied); *Am. Wildlands v. Kempthorne*, 530 F.3d 991, 1000 (D.C. Cir. 2008) ("The rationale for deference is particularly strong when the [agency] is evaluating scientific data within its technical expertise") (citation omitted); *see also Webster v. U.S. Dep't of Agric.,* 685 F.3d 411, 425-26 (4th Cir. 2012) (court will not "intrude into [agency's] decisionmaking prerogative where inadequacies identified are trivial).

While "the court may properly be skeptical as to whether an EIS's conclusions have a substantial basis in fact if the responsible agency has apparently ignored the conflicting views of other agencies having pertinent expertise, " *Sierra Club v. U.S. Army Corps of Engineers*, 701 F.2d 1011, 1030 (2d Cir. 1983), the Court is aware of no such conflicting views here. In its comments on the DEIS and specifically regarding buffer distances, the United States Fish & Wildlife Service stated that the buffer distances described "reflect our current understanding of the biological needs of these species." AR 13646. As noted by the federal defendants and intervenors, CHAPA's challenge to the underlying science of the FEIS appears to be a veiled attempt to argue that recreational interests, specifically ORV interests, should have been assigned more weight in NPS's analysis. At least one commenting state agency, North Carolina's Department of Environment and Natural Resources, would disagree, however, having noted that "[a]lthough Alternative F [the selected alternative] is acceptable to our program, it provides more visitor access (on foot and by ORV) which appears to have the potential to cause greater harm [to rare species]." AR 13660. Thus, upon its review of the record, the Court concludes that NPS's decisions were based on sound scientific data and that NEPA's hard look requirement has been satisfied in this regard.

Case 2:13-cv-00001-BO   Document 71   Filed 06/20/14   Page 21 of 23

## E. Cultural Impacts

Finally, CHAPA contends for the first time in its motion for summary judgment that NPS failed to meaningfully consider and provide the public an opportunity to review the cultural impacts of the proposed action and other alternatives. As these allegations were not raised in CHAPA's complaint, and CHAPA did at any point seek leave to amend its complaint, neither defendants nor intervenors had notice of this argument until CHAPA filed its motion for summary judgment. Under these circumstances, the Court treats this argument as having been waived and does not consider it. *See Johnson v. Brock & Scott, PLLC,* 5:11-CV-474-F, 2013 WL 6058199 (E.D.N.C. Nov. 15, 2013) ("Defendants were entitled to rely on the operative complaint as fair notice of the general factual allegations forming the basis of Plaintiff's claims.") (citing *Pickern v. Pier 1 Imports (U.S.), Inc.*, 457 F.3d 963, 969 (9th Cir. 2006) (district court did not err in finding that plaintiff failed to provide adequate notice of new allegation when raised for first time at summary judgment stage)); *see also Fleming v. Lind-Waldock & Co.*, 922 F.2d 20, 24 (1st Cir. 1990) ("summary judgment is not a procedural second chance to flesh out inadequate pleadings.").[3]

At bottom, CHAPA asks this Court to flyspeck NPS's environmental analysis in order to identify any minor deficiency to propound as a basis to reject the final rule, which the Court will not and cannot do. *Nat'l Audubon Soc'y*, 422 F.3d at 186. A holistic analysis of the process reveals that NPS engaged in a careful and detailed study of the Seashore, its wildlife and vegetation, and the visitors and residents who utilize the beaches to arrive at a plan which is based on the factors that Congress intended be considered and was not preordained or a *fait accompli*. CHAPA itself was a party to the consent decree, which was a step toward compliance

---

[3] The Court notes that CHAPA does not in its reply brief contest that it has waived this argument.

with Executive Order 11644 and 36 C.F.R. § 4.10 requiring that all ORV use on the Seashore be pursuant to a final rule or special regulation. CHAPA and its members participated fully in the rulemaking process, as is evidenced by the number of comments submitted to and considered by NPS in its formulation of an FEIS and final rule. It is clear from the record in this matter that NPS sufficiently considered all viewpoints when determining how to regulate ORV use on the Seashore, bearing in mind that NEPA evinces a "national policy . . . to promote efforts which will prevent or eliminate damage to the environment." 42 U.S.C. § 4321.

The Court thus holds that NPS's rulemaking process for ORV use on the Seashore and the record in this matter demonstrate that NPS took the requisite hard look at the environmental impacts of its proposed agency action as required by NEPA and that its final decision was reasonable and neither arbitrary nor capricious. The federal defendants and intervenors are therefore entitled to summary judgment in their favor on each of CHAPA's NEPA claims.

## CONCLUSION

Accordingly, for the foregoing reasons, CHAPA's motion for summary judgment [DE 48] is DENIED, federal defendants' motion for summary judgment [DE 58] is GRANTED IN PART and DENIED IN PART, and intervenors' motion for summary judgment [DE 56] is GRANTED IN PART and DENIED IN PART. The clerk is DIRECTED to enter judgment in favor of defendants and intervenors on each of CHAPA's claims and to close the file.

SO ORDERED, this **19** day of June, 2014.

Terrence W. Boyle

TERRENCE W. BOYLE
UNITED STATES DISTRICT JUDGE

Case 2:13-cv-00001-BO   Document 71   Filed 06/20/14   Page 23 of 23